IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NIKI MOTLAGH,<br><br>Plaintiff,<br><br>v.<br><br>OFFICER ALEN GIBIC, individually and in his official capacity; SALT LAKE CITY CORPORATION, a government entity; OFFICER MADISON SISCO, individually and in her official capacity; and OFFICER LUIZ GONZALEZ, individually and in his official capacity,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Case No. 2:22-cv-00635-TC-DBP<br><br>Judge Tena Campbell<br>Magistrate Judge Dustin B. Pead |

Before the court is the Defendants' Motion for Judgment on the Pleadings. (ECF No. 90.) For the reasons stated below, the court grants the motion.

**BACKGROUND**

The court has previously considered several motions in this action, which arises out of Plaintiff Niki Motlagh's encounters with various officers of the Salt Lake City Police Department (SLCPD) in connection with a dispute between Ms. Motlagh and her former husband, Ankit Agrawal.

Ms. Motlagh's allegations originally focused on Officer Alen Gibic's actions, as she maintained that Officer Gibic refused to help her gain access to her apartment and instead arrested her for criminal trespass despite instructions from a state court judge in a protective order directing the police to help Ms. Motlagh reenter her apartment. (See Second Am. Compl.,

ECF No. 14 at 7–8.) After carefully considering these allegations, the Honorable Dustin B. Pead recommended that the court dismiss Ms. Motlagh's Second Amended Complaint for failure to state a claim. (See R. & R., ECF No. 33.) The undersigned judge held a hearing on Ms. Motlagh's objections to that recommendation, at which time the court became concerned about statements made by Ms. Motlagh suggesting that the police treated her roughly during an encounter related to the dispute about the apartment. (Min. Entry, Aug. 31, 2023, ECF No. 43.) Although the court agreed with Judge Pead that the Second Amended Complaint should be dismissed, the court therefore granted Ms. Motlagh leave to file a Third Amended Complaint and appointed pro bono counsel to assist her. (Order & Mem. Decision, Dec. 19, 2023, ECF No. 47.) The court found that Ms. Motlagh, who speaks English as a second language, struggled to convey her legal claims clearly, and that her claims were potentially complex. (Id. at 5.)

Ms. Motlagh has been ably represented by attorneys from Snell & Wilmer, and the court thanks counsel for their briefing and argument on the issues.[1] Ms. Motlagh asserted two causes of action against Officer Gibic in her Third Amended Complaint, but the court dismissed those claims after finding that they were foreclosed by the Supreme Court's ruling in Castle Rock v. Gonzales, in which the Court held that police departments have substantial discretion when enforcing protective orders and that "[i]t is by no means clear that an individual entitlement to enforcement of a restraining order could constitute a 'property' interest for purposes of the Due Process Clause." 545 U.S. 748, 766 (2005). (See Order & Mem. Decision, Sept. 10, 2024, ECF No. 84 at 7.)

[1] The court notes that the Defendants' attorney, David F. Mull, also provided his clients with professional and able counsel, and that Mr. Mull treated the Plaintiff with respect even when disagreeing on the legal issues. Mr. Mull died in a hiking accident last summer, and the court expresses its condolences to his family and to those in the Salt Lake City legal community who worked with him.

Ms. Motlagh's remaining claim, for excessive force, did not involve Officer Gibic but instead arose out of an incident on February 12, 2021. (See Third Am. Compl. ¶¶ 19–47, ECF No. 54.) The following facts, which the court draws from the Third Amended Complaint, are relevant to that claim.

Ms. Motlagh asserts that Mr. Agrawal sexually and physically assaulted her on November 1, 2020; that he was arrested and charged with four felonies and one misdemeanor; and that he eventually pled guilty to two criminal misdemeanor charges and received a suspended sentence, was ordered to pay restitution, and was put on probation for 12 months. (Id. ¶¶ 14–17.) Upon release, Mr. Agrawal returned to an apartment that Ms. Motlagh had previously rented on her own, convinced the apartment's management to put him on the lease, and then called the SLCPD on January 25, 2021, to request a temporary protective order (TPO). (Id. ¶¶ 12, 18 & n.1.) The TPO was never issued, and Ms. Motlagh and Mr. Agrawal continued to live together. (Id. ¶¶ 18 n.1, 19.)

Over the next few weeks, Ms. Motlagh claims that Mr. Agrawal threatened and intimidated her and that she would often scream and cry, hoping that a neighbor would report the situation. (Id. ¶¶ 20–21.) On February 12, 2021, the pair argued after Ms. Motlagh demanded that Mr. Agrawal move out; during the fight, Mr. Agrawal called the SLCPD and told the police that Ms. Motlagh had stolen his laptop and passport. (Id. ¶¶ 22–23.) Feeling unsafe, Ms. Motlagh left the apartment and also called the SLCPD. (Id. ¶¶ 24–25.) Two officers, Defendants Madison Sisco and Luiz Gonzalez, responded to the calls. (Id. ¶ 26.) Officers Sisco and Gonzalez interviewed Mr. Agrawal in the apartment and then spoke to Ms. Motlagh outside the apartment in front of her car. (Id. ¶¶ 26, 29.) Mr. Agrawal approached the officers during this conversation and showed them a video of Ms. Motlagh he claimed to have taken earlier in

the evening. (Id. ¶ 35.) In the video, Ms. Motlagh was crying and said that she wanted to die. (Id. ¶ 38.) Even though Mr. Agrawal admitted that he had previously been arrested for his actions against Ms. Motlagh, and despite the lack of evidence corroborating Mr. Agrawal's claims about the fight that evening, Officers Sisco and Gonzalez stated to each other that they were going to "pink sheet [Ms. Motlagh's] ass" and detained Ms. Motlagh for a mental health evaluation. (Id. ¶¶ 27, 36, 39.)

While the officers were handcuffing her, Ms. Motlagh told them that she had a broken wrist and "asked them to take precautions to prevent further injury." (Id. ¶ 41.) The officers nevertheless continued to twist Ms. Motlagh's wrist and force her into handcuffs. (Id. ¶ 42.) After the ambulance arrived, the officers "again twisted and mishandled Motlagh's right wrist" while removing her handcuffs. (Id. ¶ 43.) Ms. Motlagh alleges that her wrist was permanently injured as a result of the officers' conduct. (Id. ¶ 46.) At the hospital, healthcare workers found that Ms. Motlagh was mentally stable. (Id. ¶ 47.)

## LEGAL STANDARD

The court reviews a Rule 12(c) motion for judgment on the pleadings under the same standard it uses to consider a Rule 12(b)(6) motion to dismiss. See Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Pa., 442 F.3d 1239, 1244 (10th Cir. 2006), abrogated on other grounds as recognized in Magnus, Inc. v. Diamond State Ins. Co., 545 F. App'x 750, 753 (10th Cir. 2013). Accordingly, the court "accept[s] all facts pleaded by the non-moving party as true and grant[s] all reasonable inferences from the pleadings in favor of the same." Id. "Judgment on the pleadings is appropriate only when 'the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law.'"

Sanders v. Mountain Am. Fed. Credit Union, 689 F.3d 1138, 1141 (10th Cir. 2012) (quoting Park Univ., 442 F.3d at 1244).

## ANALYSIS

There are three Defendants remaining in the case: Officers Sisco and Gonzalez, and Salt Lake City Corporation (Salt Lake City). Officers Sisco and Gonzalez argue that the court should dismiss the excessive force claim against them because they are entitled to qualified immunity. For its part, Salt Lake City argues that there can be no municipal liability where there is no underlying constitutional violation. But before turning to the merits of these arguments, the court must first resolve a different dispute between the parties: whether the court may consider video evidence of the encounter between Ms. Motlagh and Officers Sisco and Gonzalez.

### I. Consideration of Video Evidence

In support of the Defendants' motion for judgment on the pleadings, Officers Sisco and Gonzalez have submitted footage from their body-worn cameras showing the officers' interactions with Ms. Motlagh. (See ECF No. 92.) Ms. Motlagh objects that such footage is extrinsic evidence that the court cannot consider at this stage of the proceedings. (Pl.'s Resp. to Mot. J. Pleadings, ECF No. 95 at 6–9.) Several months after hearing argument on this question, the Tenth Circuit issued an opinion that is directly on point. See Fuqua v. Santa Fe Cnty. Sheriff's Off., 157 F.4th 1288 (10th Cir. 2025). With the benefit of this recent Tenth Circuit precedent, the court finds that it is not appropriate to consider the footage without converting the motion to a motion for summary judgment.

In Fuqua, the Tenth Circuit noted the general rule that, when deciding a motion to dismiss, the district court typically cannot look beyond the four corners of the complaint. Id. at 1297 (citing Cuervo v. Sorenson, 112 F.4th 1307, 1312 (10th Cir. 2024)). The Tenth Circuit

then considered whether any exceptions applied that would have allowed the district court to consider footage from dashboard and body cameras when determining qualified immunity at the motion to dismiss stage. Courts may consider "documents that a plaintiff (1) attaches to her complaint; (2) incorporates by reference in her complaint; or (3) refers to in her complaint and that are central to her complaint and indisputably authentic." Cuervo, 112 F.4th at 1312. But because the plaintiff—even though he had also submitted two videos in response to the motion to dismiss—stated that he did not want the court to consider the videos until summary judgment, the Tenth Circuit held that "the videos' mere presence in the record did not give the court leeway to consider them when deciding the officers' motion to dismiss." Fuqua, 157 F.4th at 1298. The Tenth Circuit also rejected the argument that a district court could take judicial notice of dash- and body-camera videos as public records. Id. at 1298–99.

Finally, the Tenth Circuit considered a line of cases from the Sixth Circuit that the Defendants have also cited here. (See Def.'s Reply, ECF No. 99 at 5–6[2] (citing Bell v. City of Southfield, 37 F.4th 362, 364 (6th Cir. 2022)). Under the Sixth Circuit's rule, a district court may consider video evidence when that evidence blatantly contradicts or utterly discredits the allegations in the complaint. See Saalim v. Walmart, Inc., 97 F.4th 995, 1002 (6th Cir. 2024); Bailey v. City of Ann Arbor, 860 F.3d 382, 386–87 (6th Cir. 2017). The Tenth Circuit found that, even if it were to adopt the Sixth Circuit's approach, the videos at issue did not clearly contradict the complaint's allegations that officers shot the plaintiff while unarmed and posing no threat—even though the videos demonstrated that the plaintiff had fired a BB gun and fled toward an occupied vehicle before dropping the gun. Fuqua, 157 F.4th at 1300–01.

[2] Citations are to PDF page numbers, not internal document pages.

Applying Fuqua, the court finds that any "blatant contradiction" exception should be read narrowly and that it would therefore be improper to consider the video evidence submitted by the Defendants. The Defendants argue that the body camera footage is central to Ms. Motlagh's complaint and that the Third Amended Complaint incorporates the footage by reference to private conversations between the officers and between Officer Sisco and Mr. Agrawal, using quotations that could only have come from the video footage. But these arguments are precisely the arguments the Tenth Circuit rejected. See Fuqua, 157 F.4th at 1307 (Tymkovich, J., dissenting) (noting that the videos were central to the plaintiff's claims, that they undoubtedly depicted the allegations in the complaint, and that plaintiff's counsel had conceded he relied on the videos to draft the complaint).

The Defendants also assert that the body camera footage blatantly contradicts Ms. Motlagh's allegations. The court has examined the body camera footage solely for the purpose of determining whether any discrepancies between the footage and Ms. Motlagh's account of the encounter could be characterized as a blatant contradiction. The court finds that the discrepancies do not rise to that level, primarily because Ms. Motlagh's allegations are not specific enough to make any contradiction so blatant.

For instance, Ms. Motlagh alleges: "While she was being handcuffed, Motlagh told the Officers that her right wrist was already broken and asked them to take precautions to prevent further injury." (Third Am. Compl. ¶ 41.) The footage corroborates this allegation. (Gonzalez Body-Worn Camera (BWC) at 10:51–59, Ex. C to Def.'s Mot. J. Pleadings, ECF No. 92.)

Ms. Motlagh then alleges that, "[d]espite this information, the Officers continued to twist Motlagh's right wrist and forced it into handcuffs." (Third Am. Compl. ¶ 42.) While it is not evident from the video footage that Officer Gonzalez, who is holding Ms. Motlagh's right hand,

twists her wrist any further after learning that her wrist is broken, it is true that Officer Gonzalez continues to hold Ms. Motlagh's right wrist in a twisted position so that Officer Sisco may place her in handcuffs. (Gonzalez BWC at 10:56–11:00.) Rather than contradicting the statements in the Third Amended Complaint, the video provides additional context that Ms. Motlagh's allegations omit—namely, that Officer Sisco states she is "going to be nice on [the wrist]" and asks Ms. Motlagh if the handcuffs are too tight, and that Officer Gonzalez states: "We're just going to lock those so that they don't get tighter on you." (Sisco BWC at 11:00–11, Ex. B to Def.'s Mot. J. Pleadings, ECF No. 92; Gonzalez BWC at 11:09–18.)

Next, Ms. Motlagh alleges that when Officers Sisco and Gonzalez removed the handcuffs after the ambulance arrived, "the Officers again twisted and mishandled Motlagh's right wrist …." (Third Am. Compl. ¶ 43.) The footage provides additional context, given that Officer Sisco asks Ms. Motlagh which wrist was "the bad one" before stating: "Give me one second and I'll get that one off last." (Sisco BWC at 22:37–43.) Indeed, the footage indicates that Officer Sisco proceeded cautiously and did not unnecessarily twist Ms. Motlagh's wrist while removing the handcuffs. But it is also not conclusive that no twisting or mishandling—an inherently vague term—occurred.

Finally, Ms. Motlagh alleges that, "[w]hile they were putting on and taking off the handcuffs, the Officers failed to take precautions to prevent further injury to Motlagh's wrist." (Third Am. Compl. ¶ 44.) As discussed above, the footage demonstrates several instances in which Officers Sisco and Gonzalez showed concern for Ms. Motlagh's wrist. But it is possible that these precautions were insufficient to prevent further injury.

In sum, the court finds that the discrepancies between the Third Amended Complaint and the body camera footage mostly amount to omissions in the complaint about statements and

actions taken by Officers Sisco and Gonzalez that show their concern for Ms. Motlagh's injury. Given the Tenth Circuit's narrow reading of what rises to the level of a blatant contradiction, the court declines to rely on the body camera footage to determine whether Officers Sisco and Gonzalez are entitled to qualified immunity. But, as the court discusses below, that determination does not carry the day for the Plaintiff.

**II. Qualified Immunity**

Turning to the merits of the Defendants' argument about qualified immunity, the court finds that Ms. Motlagh has failed to plead a clearly established violation of constitutional law.

Under the doctrine of qualified immunity, an officer is shielded from liability unless the officer "violated a constitutional or statutory right" that "was clearly established at the time of the alleged unlawful activity." Lincoln v. Maketa, 880 F.3d 533, 537 (10th Cir. 2018) (cleaned up). "Although qualified immunity defenses are typically resolved at the summary judgment stage, district courts may grant motions to dismiss on the basis of qualified immunity[,]" albeit on "a more challenging standard of review than would apply on summary judgment." Thomas v. Kaven, 765 F.3d 1183, 1194 (10th Cir. 2014) (citations omitted). The Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Pearson v. Callahan, 555 U.S. 223, 232 (2009) (quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)).

"When a § 1983 defendant raises the qualified immunity defense, the burden shifts to the plaintiff." Sawyers v. Norton, 962 F.3d 1270, 1282 (10th Cir. 2020) (citation omitted). To overcome qualified immunity, a plaintiff must show "(1) facts that demonstrate the officials violated a federal constitutional or statutory right, which (2) was clearly established at the time of the defendant's conduct." Id. (citations omitted). The Supreme Court has admonished courts

"not to define clearly established law at a high level of generality." Kisela v. Hughes, 584 U.S. 100, 104 (2018) (citations omitted). And although "a case directly on point" is not required, "existing precedent must have placed the … constitutional question [regarding the illegality of the defendant's conduct] beyond debate." Cummings v. Dean, 913 F.3d 1227, 1239 (10th Cir. 2019) (citations omitted). "Ordinarily … there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Toevs v. Reid, 685 F.3d 903, 916 (10th Cir. 2012) (citation omitted). The court should not "consider district court opinions in evaluating the legal landscape for purposes of qualified immunity." Ullery v. Bradley, 949 F.3d 1282, 1300 (10th Cir. 2020).

**A. Constitutional Violation**

The Fourth Amendment prohibits "unreasonable searches and seizures[.]" U.S. Const. amend. IV. A plaintiff bringing an excessive force claim must allege that 1) a seizure occurred; and 2) the seizure was unreasonable. Thomas v. Durastanti, 607 F.3d 655, 663 (10th Cir. 2010).

Here, it is clear that a seizure occurred. Ms. Motlagh's liberty was restrained by the use of handcuffs, even if the police released her from handcuffs when the ambulance arrived and Ms. Motlagh agreed to go to the hospital voluntarily. See Torres v. Madrid, 592 U.S. 306, 311 (2021) (noting that "common law arrests are Fourth Amendment seizures" and that "the common law considered the application of force to the body of a person with intent to restrain to be an arrest"). The court therefore turns to whether the seizure was reasonable.

When considering an excessive force claim, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount

of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 397 (1989). The court looks at "the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment." Emmett v. Armstrong, 973 F.3d 1127, 1135 (10th Cir. 2020) (citation omitted).

The Supreme Court has identified three non-exhaustive factors that the court should consider to evaluate the reasonableness of an officer's use of force: 1) "the severity of the crime at issue"; 2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and 3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396. The court agrees with Ms. Motlagh that these factors all weigh in favor of a finding that the officers were justified in using only minimal force against her. Taking the allegations in the Third Amended Complaint in the most favorable light, there was no evidence that Ms. Motlagh had committed a serious crime,[3] she did not pose a threat to the officers' safety, and she was not actively resisting arrest or attempting to flee.

But Ms. Motlagh takes this argument further. In both her Third Amended Complaint and in her response to the Defendants' motion, she maintains that any use of force was unreasonable, and that Officers Sisco and Gonzalez had no justification for placing her in handcuffs at all.

The court is not persuaded. Although a seizure of a person for an emergency mental health evaluation is "closely analogous" to a "criminal arrest," and must be supported by probable cause sufficient to justify a criminal arrest, Pino v. Higgs, 75 F.3d 1461, 1468 (10th

[3] Ms. Motlagh acknowledges that Mr. Agrawal accused her of throwing items around the apartment and hitting him in the face. (Third Am. Compl. ¶ 26.) These accusations could have resulted in an assault charge. See Utah Code Ann. § 76-5-102(2) ("An actor commits assault if the actor … commits an act, with unlawful force or violence, that … causes bodily injury to an individual[.]"). But Ms. Motlagh also alleges that the Officers were "not able to identify any items that had been thrown in the Apartment or any injury on Agrawal's face." (Id. ¶ 27.)

Cir. 1996), Ms. Motlagh has not alleged a claim for unlawful seizure. And the Tenth Circuit has instructed the district court to differentiate an unlawful seizure claim from an excessive force claim.

In Mglej v. Gardner, Plaintiff Matthew Mglej alleged that Deputy Raymond Gardner had detained him without probable cause when Mr. Mglej refused to provide his identification during questioning about a local robbery. 974 F.3d 1151, 1157–58 (10th Cir. 2020). Mr. Mglej also alleged that Deputy Gardner placed him in handcuffs that were fastened so tightly that Mr. Mglej's hands turned red and Deputy Gardner eventually had to use tools to pry the handcuffs off Mr. Mglej's wrists. Id. The Tenth Circuit held that the district court must evaluate these claims separately:

> As an initial matter, the district court erred to the extent it linked [the] excessive force claim to Mglej's false-arrest claim, by holding that, "[b]ecause Officer Gardner lacked probable cause to believe a crime had occurred, any effort to constrain Mr. Mglej's liberty would have been excessive." Cortez v. McCauley, 478 F.3d 1108, 1127 (10th Cir. 2007) (reh'g en banc) ("reject[ing] the idea … that a plaintiff's right to recover on an excessive force claim is dependent on the outcome of an unlawful seizure claim"). Mglej's excessive-force claim is separate from his claim that Deputy Gardner unlawfully arrested him, and requires a separate inquiry. See id.; see also Maresca v. Bernalillo Cty., 804 F.3d 1301, 1308, 1313, 1316 (10th Cir. 2015); Romero v. Story, 672 F.3d 880, 890 (10th Cir. 2012).

Id. at 1165 (citation to record omitted).

In any event, the court finds that an unlawful involuntary detention claim is not supported by the allegations in the Third Amended Complaint. "[O]fficers who decide to commit an individual for a mental health evaluation must be able to articulate specific facts that lead them to believe the person is a threat to herself or others." Meyer v. Bd. of Cnty. Comm'rs of Harper Cnty., 482 F.3d 1232, 1240 (10th Cir. 2007). Here, Ms. Motlagh acknowledges that Officers Sisco and Gonzalez viewed a video in which she was crying and stated that she wanted to die.

(Third Am. Compl. ¶ 38.)[4] Ms. Motlagh suggests that, given Mr. Agrawal's history of sexual and physical abuse, the Officers should have been skeptical of his assertion that the video had been recorded that night. (See id. ¶¶ 113–14.) But threats of self-harm are not something the Officers should have ignored merely on the assumption that the video might have been recorded at a different time. Cf. Pino, 75 F.3d at 1468 ("The state has a legitimate interest … in protecting a mentally ill person from self-harm."). The court therefore finds that the decision to detain Ms. Motlagh for a mental health evaluation was objectively reasonable and supported by specific facts.

Turning to Ms. Motlagh's excessive force claim, the court first considers whether it was objectively unreasonable under the circumstances to place her in handcuffs at all. The Tenth Circuit has noted that "in nearly every situation where an arrest is authorized, or police reasonably believe public safety requires physical restraint, handcuffing is appropriate." Fisher v. City of Las Cruces, 584 F.3d 888, 896 (10th Cir. 2009) (citation omitted). And given the Tenth Circuit's holding that a seizure for an emergency health evaluation is "closely analogous" to a "criminal arrest," Pino, 75 F.3d at 1468, the court finds that an officer could reasonably believe that handcuffing was appropriate when detaining someone involuntarily for a mental health examination, cf. Graham, 490 U.S. at 396 ("[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). And it is reasonable for a police officer to assume that someone who has otherwise acted calmly may lash out after being told that they are no longer free to leave.

[4] The Defendants submitted a copy of the video with their Reply. (ECF No. 103.) The court has not relied on this evidence, nor does it need to, because Ms. Motlagh has acknowledged in her Third Amended Complaint that the Officers viewed a video in which she was distraught and expressed thoughts of suicide.

But even if it was objectively reasonable to handcuff Ms. Motlagh, it does not follow that the manner in which she was handcuffed must have been objectively reasonable as well. See Mglej, 974 F.3d at 1166–67 (finding that the decision to handcuff was objectively reasonable but the manner of handcuffing was not). "An excessive force claim that includes a challenge to the '[m]anner or course of handcuffing' requires the plaintiff to show both that 'the force used was more than reasonably necessary' and 'some non-de minimis actual injury.'" Donahue v. Wihongi, 948 F.3d 1177, 1196 (10th Cir. 2020) (quoting Fisher, 584 F.3d at 897–98).

The court finds that Ms. Motlagh fails to allege that the force used by Officers Sisco and Gonzalez was more than reasonably necessary to detain her. Ms. Motlagh alleges that she told the Officers about her broken wrist "[w]hile she was being handcuffed," not before. (Third Am. Compl. ¶ 41.) Although she also alleges that, based on their conversation with Mr. Agrawal, the Officers knew that "she had a big surgery coming up[,]" there is no indication that Mr. Agrawal specifically mentioned her wrist. (Id. ¶ 28.) Accordingly, there are no allegations rising beyond mere speculation that the Officers were aware of her specific injury before they initially twisted her right wrist to apply the handcuffs. Moreover, Ms. Motlagh does not allege that she cried out in pain, that she asked the Officers to stop applying the handcuffs, or that she asked the Officers to loosen the handcuffs at any point. Indeed, in an affidavit that Ms. Motlagh attached to her response to the motion for judgment on the pleadings, she testified that she did not start to feel pain in her broken wrist due to the handcuffs until she got out of the cold and her wrist was less numb. (Aff. Niki Motlagh ¶¶ 27–29, ECF No. 95-1.) There are therefore no facts in the Third Amended Complaint, nor does it appear that Ms. Motlagh could allege any, that plausibly support the assertion that it was objectively reasonable for an officer to know the handcuffs were causing Ms. Motlagh pain and likely to result in lasting injury.

Given that the Officers only learned of her injury while applying the handcuffs, and that Ms. Motlagh did not give the Officers any indication that she was in pain, the court finds that Ms. Motlagh has failed to allege a constitutionally unlawful application of force.

**B. Clearly Established Law**

Even if the court were to decide that she suffered a constitutional violation of her rights, Ms. Motlagh has failed to demonstrate that the violation was clearly established, such that "every reasonable official would have understood that what he is doing violates that right." Reichle v. Howards, 566 U.S. 658, 664 (2012) (cleaned up).

In her response to the Defendants' motion, Ms. Motlagh cites two district court cases and a Sixth Circuit case. (ECF No. 95 at 19.) These cases, which do not include a Supreme Court or Tenth Circuit decision on point, are insufficient to demonstrate that "the clearly established weight of authority from other courts [has] found the law to be as the plaintiff maintains." Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). Indeed, the Tenth Circuit has "decline[d] to consider district court opinions in evaluating the legal landscape for purposes of qualified immunity." Ullery, 949 F.3d at 1300.

And the Sixth Circuit case presents facts that are distinguishable. The Sixth Circuit found that "an excessive use of force claim could be premised on [an officer] handcuffing [the plaintiff] if he knew that [the plaintiff] had an injured arm and if he believed that she posed no threat to him." Walton v. Southfield, 995 F.2d 1331, 1342 (6th Cir. 1993). But in that case, the plaintiff maintained that "she begged not to be handcuffed because of her injured shoulder." Id. Ms. Motlagh has alleged no similar facts here that would have given the Officers reason to believe the handcuffs were causing her significant pain.

The Tenth Circuit has expressed doubt that handcuffing can rise to the level of excessive force where officers have no knowledge of a detainee's injuries, Fisher, 584 F.3d at 896 ("[w]e hasten to add this might be a very different case if the officers had no knowledge of [the plaintiff's] injuries"), or where the plaintiff "utter[s] no complaint about the possible exacerbation of his injuries." Id. And in cases where the Tenth Circuit has found that officers were not entitled to qualified immunity for an excessive force claim based on the manner in which they applied handcuffs, the potential injuries have been far more obvious. See, e.g., Mglej, 974 F.3d at 1158 (affirming denial of qualified immunity where handcuffs were so tight that the plaintiff's hands turned red and the handcuffs had to be pried off with tools); Fisher, 584 F.3d at 892 (reversing a grant of qualified immunity where an officer handcuffed the plaintiff behind his back even though the plaintiff pleaded not to be handcuffed because he had shot himself in the bicep and the resultant swelling was so severe the officer had to place her knee on the plaintiff's back to leverage the plaintiff's hands behind his body).

The court therefore finds that it is not clearly established that the mere act of handcuffing someone who has been detained for a mental health evaluation rises to the level of excessive force or that the manner of handcuffing rises to that level absent some indication that the detainee is in pain or an advance awareness of a preexisting injury sufficient to reasonably warn an officer that handcuffing would likely result in lasting injury.

### III. Municipal Liability

Because the court finds that no constitutional violation occurred, the court dismisses Ms. Motlagh's municipal liability claim against Salt Lake City. See Trigalet v. City of Tulsa, 239 F.3d 1150, 1154–55 (10th Cir. 2001) (recognizing the need for a predicate constitutional violation to impose liability against a municipality under § 1983).

**ORDER**

For the foregoing reasons, the court ORDERS as follows:

1. The Defendants' Motion for Judgment on the Pleadings (ECF No. 90) is GRANTED.

2. The Plaintiff's claim for excessive force is DISMISSED WITH PREJUDICE.

DATED this 29th day of September, 2026.

BY THE COURT:

Tena Campbell
United States District Judge